IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| LAURIE L. DURHAM,<br><br>                    Plaintiff,<br><br>vs.<br><br>KILOLO KIJAKAZI, *Acting Commissioner of Social Security Administration*,<br><br>                    Defendant. | CV 20-172-BLG-SPW<br><br><br>**ORDER** |

Plaintiff Laurie L. Durham ("Durham") has filed a complaint pursuant to 42 U.S.C. §§ 405(g), 1383(c) of the Social Security Act, requesting judicial review of the final administrative decision of the Commissioner of Social Security ("Commissioner"), denying her claim for disability insurance benefits under Title II, and supplemental security income under Title XVI, of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, 1381-83f. (Docs. 1, 8.) The Commissioner subsequently filed the Administrative Record ("A.R."). (Doc. 6.)

Presently before the Court is Plaintiff's motion for summary judgment, seeking reversal of the Commissioner's denial and remand for further proceedings. (Doc. 8.) The motion is fully briefed and ripe for the Court's review. (*See* Docs. 10, 11.)

1

For the reasons set forth herein, and after careful consideration of the record and applicable law, the Court finds this matter should be REMANDED for further proceedings.

## I.    PROCEDURAL BACKGROUND

Durham filed her application for disability insurance benefits and supplemental security income on April 23, 2018. (A.R. 320.) The Social Security Administration initially denied Durham benefits on August 24, 2018. (A.R. 16.) Durham subsequently requested a hearing by an Administrative Law Judge ("ALJ"). (*Id.*) A hearing was held on January 14, 2020. (*Id.*) ALJ Michele M. Kelley issued a written decision on February 20, 2020, finding Durham not disabled. (A.R. 34.) Durham requested review of the ALJ's decision before the Appeals Council, but the request was denied. (A.R. 6.) Durham thereafter filed the instant action. (Doc. 1.)

## II.    LEGAL STANDARDS

### A.    Scope of Review

The Social Security Act allows unsuccessful claimants to seek judicial review of the Commissioner's final agency decision. 42 U.S.C. §§ 405(g), 1383(c)(3). The scope of judicial review is limited. The Court must affirm the Commissioner's decision unless it "is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). *See*

also *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("We may reverse the ALJ's decision to deny benefits only if it is based upon legal error or is not supported by substantial evidence."); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Tidwell*, 161 F.3d at 601 (citing *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Flaten*, 44 F.3d at 1457. In considering the record as a whole, the Court must weigh both the evidence that supports and detracts from the ALJ's conclusions. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975)). The Court must uphold the denial of benefits if the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *Flaten*, 44 F.3d at 1457 ("If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary."). However, even if the Court finds that substantial evidence supports the ALJ's conclusions, the Court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching a conclusion. *Benitez v. Califano*, 573 F.2d

3

653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968)).

## B.   Determination of Disability

To qualify for disability benefits under the Social Security Act, a claimant must show two things: (1) he suffers from a medically determinable physical or mental impairment that can be expected to last for a continuous period of twelve months or more, or would result in death; and (2) the impairment renders the claimant incapable of performing the work he previously performed, or any other substantial gainful employment which exists in the national economy.  42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A).  A claimant must meet both requirements to be classified as disabled.  *Id.*

The Commissioner makes the assessment of disability through a five-step sequential evaluation process.  If an applicant is found to be "disabled" or "not disabled" at any step, there is no need to proceed further.  *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005) (quoting *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 974 (9th Cir. 2000).  The five steps are:

1. Is claimant presently working in a substantially gainful activity?  If so, then the claimant is not disabled within the meaning of the Social Security Act.  If not, proceed to step two.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. Is the claimant's impairment severe?  If so, proceed to step three.  If not, then the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1? If so, then the claimant is disabled. If not, proceed to step four. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

## III.   FACTUAL BACKGROUND

### A.   The Hearing

A hearing was held before the ALJ on January 14, 2020 in Billings, Montana. (A.R. 154.) At the hearing, Durham testified that she previously suffered from a condition termed "frozen shoulder" but has since had corrective surgery and, while she does not have full range of motion, the surgery has significantly helped including with her overhead reach. (A.R. 162.) Durham stated she has arthritis in her back and left wrist that cause her issues with lifting and holding on to objects. (A.R. 163.) She cannot type with her left hand but can type with her right hand. (A.R. 164.) She experiences pain in her back due to a bulged disk that flares up on occasion. She occasionally has difficulty walking as a result. (A.R. 164.) Sitting for extended periods of time causes pain and she regularly

5

stands up to stretch and relieve the pain after about an hour sitting. (A.R. 165.)
Durham stated that she believed she could stand without problem for 45 minutes so
long as she was moving around and doing something. (A.R. 166.) She stated she
could probably walk an hour on flat surfaces and lift a gallon jug of water with her
right hand. (A.R. 167.) She could not lift that weight with her left hand without
causing severe pain. (A.R. 167.)

Durham testified that she occasionally requires assistance putting on or
taking off tighter-fitting clothing items because she cannot bend her right arm
backwards enough to slip it through the sleeve. (A.R. 168.) Durham stated she was
diagnosed with fibromyalgia years ago, but she does not seek active medical
treatment and feels that it is no longer an issue. (A.R. 169.) However, she stated
she deals with her irritable bowel syndrome every day and was seeking active
medical treatment for it. Her symptoms include stabbing pain as well as periods of
time where she either cannot use the bathroom at all or experiences diarrhea. (A.R.
170.) She also experiences migraines but receives Botox injection treatments that
have helped limit the number of episodes she experiences. (A.R. 171-172.)

Durham stated she experiences a form of narcolepsy that includes cataplexy.
(A.R. 175.) This results in her body bending or falling forward without her control
occasionally when she forgets to take her sleep medication. (A.R. 175.) The
medication helps with the falling or bending symptoms, but Durham stated she is

6

constantly tired and requires frequent naps. (A.R. 175.) This tiredness leads to further issues with memory loss and confusion. (A.R. 175.) Durham testified that she has sought medical advice on the memory issues and her doctor believes it is a side-effect of the narcolepsy because she has not been diagnosed with dementia or any other mental disorder. (A.R. 176.)

As for her daily activities, Durham stated she takes two naps in the morning and up to three in the afternoon. (A.R. 177.) This routine has helped mitigate her narcolepsy symptoms. (A.R. 177.) Her boyfriend often has to drive her to places or social events in order for her to nap on the way. Otherwise, she has to pull over and nap in her car. (A.R. 178.) She no longer drives before noon because her narcoleptic symptoms are more intense in the mornings. (A.R. 179.) She stated she can make the trip between Billings and Laurel for appointments—about a 30-minute trip—but struggles not to nap before she begins the drive back to Laurel. (A.R. 185.) If she tries to fight the urge to sleep, Durham stated her palms begin to sweat and she shakes uncontrollably almost as if she is having a seizure. (A.R. 180.) Durham also sees two counselors and is medicated for depression which she believes is caused by the narcolepsy. (A.R. 181.)

Last, the vocational expert ("VE"), Anne Taylor Arrington, summarized Durham's work history—including department manager, pharmacy tech, medical biller, customer complaint clerk, and journalist—rated them per DOT categories,

7

and opined that several jobs in the national economy existed under the hypothetical posed: officer helper, rental clerk, and a counter clerk. (A.R. 206-207.) The hypothetical involved an individual with the same work history, education, and age as Durham; can lift and carry 10 pounds frequently and 20 pounds occasionally; walk and stand 6 hours in an 8-hour work day, sit for 6 hours in an 8-hour work day; frequently reach overhead bilaterally; must avoid concentrated exposure to cold, loud noise, vibrations, and even moderate exposure to wet, slippery surfaces; can understand, remember and carry out simple, detailed, and complex tasks; and can tolerate interaction with supervisors, co-workers, and the public in routine work settings. (A.R. 207-208.)

The ALJ then posed the same hypothetical but limited the individual to infrequently climbing ramps and stairs, frequently balancing, frequently kneeling and crouching; occasionally stooping; cannot climb ladders, ropes or scaffolds; and occasionally handle and frequently finger with the upper left extremity. (A.R. 209-210.) The VE opined such a hypothetical would eliminate all of Durham's past work except customer complaint clerk and journalist. (A.R. 210-211.) However, the VE believed the rental clerk and counter clerk occupations would remain available as would the office helper position. (A.R. 211.) The VE also opined to the availability of an unskilled position as a bakery worker. (A.R. 211.)

8

The ALJ posed a third hypothetical with the same characteristics as either of the first two hypotheticals, but the individual can only understand, remember, and carry out simple tasks with the persistence and pace of a 40-hour work week. The individual can tolerate interactions with supervisors, co-workers, and the public; can tolerate usual, simple, work situations; and can tolerate occasional changes in routine work settings. (A.R. 211-212.) The VE stated that such an individual could not perform any of Durham's past occupations but could perform as an office helper, rental clerk, counter clerk, or bakery conveyor line worker. (A.R. 212.)

The ALJ then posed one final hypothetical with the same work history, education, and age as Durham. The hypothetical individual would be off-task 20 percent of an 8-hour day and 40-hour work week, whether at her workstation or not at work, and this 20 percent included normal breaks. (A.R. 212.) The VE stated that such an individual could not perform any of Durham's past occupations and that there were no jobs in the national economy for the individual. (A.R. 212-213.)

### B.     The ALJ's Findings

The ALJ followed the five-step sequential evaluation process in considering Durham's claim.  (A.R. 17-18.)

At step one, the ALJ found that Durham had not engaged in substantial gainful activity since her alleged onset date of September 26, 2017.  (A.R. 19.)

At step two, the ALJ found Durham has the following severe impairments: left wrist tendonitis, status post scapholunate ligament repair with subsequent instability, right shoulder adhesive capsulitis, status post arthroscopic capsular release, status post bursectomy, narcolepsy with cataplexy, migraine headaches, anxiety and somatic disorder.  (A.R. 19.)

At step three, the ALJ found that Durham does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in the appendix.  (A.R. 21.)

At step four, the ALJ stated Durham has the residual functional capacity ("RFC") to perform light work such that she can lift, carry, push or pull 10 pounds frequently and 20 pounds occasionally; can walk and stand about 6 hours in an 8-hour workday; can sit about 6 hours in an 8-hour workday; can frequently push and pull with the bilateral upper extremities; can frequently reach overhead with the bilateral upper extremities; can occasionally handle with the left upper extremity, but can frequently finger with the left upper extremity; can frequently climb ramps and stairs; can frequently balance, kneel and crouch; can occasionally stoop and crawl; can never climb ladders, ropes or scaffolds; needs to avoid concentrated exposure to extreme cold, vibrations, fumes, odors, dusts, gases and poor ventilation; needs to avoid concentrated exposure to noise levels greater than 3 out of 5, as defined in the Selected Characteristics of Occupations; needs to avoid even

moderate exposure to wet surfaces, slipper surfaces, uneven surfaces, unprotected heights, dangerous moving machinery, and other workplace hazards; can understand, remember, and carry out simple tasks; can maintain attention, concentration, persistence, and pace for such tasks for 8-hour workdays and 40-hour workweeks; can tolerate interaction with supervisors, coworkers, and members of the public; and can tolerate usual simple work situations and occasional changes in the routine work setting. (A.R. 24-25.) However, the ALJ found that Durham is unable to perform any past relevant work. (A.R. 32.)

Finally, at step five, the ALJ found that based on Durham's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform. (A.R. 33.)

Accordingly, the ALJ found Durham not disabled. (A.R. 34.)

## IV.   Discussion

Durham argues that the ALJ erred in (1) improperly discounting the findings and conclusions of the physicians and healthcare providers; (2) failing to provide any reference to support her findings discounting Durham's subjective allegations; and (3) failing to incorporate all limitations into the vocational consultant's hypothetical, including evaluation of the time away from work for medical appointments. (Doc. 8 at 4.) The Court will address each in turn.

### A.    ALJ's Evaluation of Medical Source Opinions

11

Durham makes a general argument that the ALJ failed to properly consider the findings and conclusions of medical providers. It is not entirely clear which medical provider findings Durham believes should have received further consideration. Her opening brief identifies certain findings of Dr. English that "noted variable levels of arousal/alertness causing fluctuation in attentional processes" that "produce a more generalized effect on cognitive efficiency with episodic forgetfulness or subjective concerns about memory." (Doc. 8 at 28-29.) Durham asserts Dr. English's findings and opinions were improperly discounted. Durham also broadly argues in her reply brief that the ALJ's considerations regarding Suzanne Richards, Patricia Nichols, and Roy Kohler were improper but fails to point to any specific opinion from those providers. (Doc. 11 at 3.) The Commissioner responds that the ALJ properly found certain statements of Dr. English unpersuasive as the statements were unsupported and inconsistent with the medical record. (Doc. 10 at 16.)

For claims filed after March 27, 2017, an ALJ must evaluate and weigh the persuasiveness of all medical opinions using the factors specified in the Social Security Administration's amended regulations. 20 C.F.R. § 416.920c(a); *Danielle A. on behalf of KRA v. Comm'r of Soc. Sec.*, 2021 WL 3083483, *4 (E.D. Wash. July 21, 2021). Those factors include supportability, consistency, relationship with the claimant, specialization, and others. 20 C.F.R. § 416.920c(c)(1)-(5). "The ALJ

12

must explain how she considered the supportability and consistency factors, but an explanation for the remaining factors is not required except when deciding among differing yet equally persuasive opinions or findings on the same issue." *Danielle*, 2021 WL 3083483, at *4. The regulations no longer require the ALJ to give specific deference or weight to medical opinions depending on that opinion's source. 20 C.F.R. § 416.920c(a). Regarding supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

The ALJ noted that Dr. English made several observations about the severity of Durham's impairments and mental function. It appears that the ALJ only discounted one opinion:

> The undersigned finds the opinion of Dr. English concerning the claimant's medication side effects placing her at a moderate risk for a cognitive disorder affecting the claimant's quality of life unpersuasive because Dr. English relied on the claimant's subjective allegations when formulating his opinion. Additionally, Dr. English did not clarify if the claimant was compliant with her medications during his

evaluation and Dr. English's attempt to link the claimant's mental health testing to the claimant's medication is conjecture (Exhibit B28F). Moreover, Dr. English's opinion concerning the claimant's quality of life being affected is inconsistent with the claimant's vast activities of daily living and the claimant's statements to medical providers during the relevant period as cited above.

(Doc. 6 at 32.)

The ALJ's decision clearly sets forth the ALJ's reasoning behind finding Dr. English's opinion unpersuasive. The ALJ discussed why she did not find the opinion supported by or consistent with the medical record and other nonmedical evidence. The Court finds that the ALJ appropriately considered Dr. English's opinion under the amended regulations and found the opinion unpersuasive. It is no surprise that Durham wishes for a different interpretation of Dr. English's opinion. However, the ALJ, as the trier of fact, "must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).

**B.     Durham's Credibility**

Durham argues that the ALJ improperly discounted her testimony without providing specific, clear, and convincing reasons. (Doc. 8 at 21.) The Commissioner argues that the ALJ properly found the medical record contradicted Durham's testimony in several regards and provided convincing reasons for his decision. (Doc. 10 at 4.)

14

The Ninth Circuit has established a two-step analysis to determine the extent to which a claimant's symptom testimony must be credited. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ determines whether the claimant has provided objective evidence of an impairment or impairments that could reasonably be expected to produce the pain or symptoms alleged. *Id.*; 20 C.F.R. § 404.1529(a), (c).  If the claimant does so and there is no evidence of malingering, then at the second step the ALJ evaluates the intensity and persistence of the symptoms. *Vasquez*, 572 F.3d at 591.

To reject the claimant's testimony, the ALJ must provide "specific, clear and convincing reasons." *Id.*  "In order for the ALJ to find [the claimant's] testimony unreliable, the ALJ must make 'a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.'" *Turner v. Commissioner of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010).  Thus, the ALJ's credibility determination "must be supported by specific, cogent reasons," with general findings insufficient. *Reddick*, 157 F.3d at 722; *Lester*, 81 F.3d at 834. *See also* 20 C.F.R. § 404.1529(c)(3).

Here, the ALJ found "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and

15

limiting effects of these symptoms are not entirely consistent with the medical

evidence and other evidence in the record for the reasons explained in this

decision." (A.R. 30.) Durham stated that her symptoms included "wrist pain, hand

pain, vertigo, drowsiness, confusion, tremors, fatigue, headaches, difficulty seeing

and difficulty sleeping . . . ." (A.R. 25.) Durham alleged these symptoms limited

her in several ways including in her ability to lift, bend, squat, walk for more than

100 feet, kneel, talk, climb stairs, remember, complete tasks and follow

instructions. (A.R. 25.) She also claimed that her symptoms limited her ability to

handle her personal care, drive a motor vehicle, and that her symptoms required

her to nap five times a day. (A.R. 25.)

The ALJ went on to review the available medical records and determined

several discrepancies existed between the reported evidence and Durham's claims.

The ALJ stated:

> Turning to the objective medical evidence, the record does not fully
> support the claimant's allegations concerning the claimant's inability to
> engage in all work at the light exertional level since September 26,
> 2017, her alleged onset date. The claimant has a long history of a left
> wrist impairment dating back to early 2016. Then, in July 2017, an
> imaging report found the claimant to have a scapholunate ligament
> injury and tendinosis of the left hand (Exhibits B2F/3). Afterwards, in
> September 2017, the claimant underwent a left scapholunate ligament
> repair with wrist flexor tendon graft, which she tolerated well (Exhibit
> B2F/3 & 8 *see* Exhibits B7F/57 & B11F/3). The claimant also has a
> history of right shoulder pain dating back to November 2018.
> Subsequently, in February 2019, an imaging report found the claimant
> to have mild acromioclavicular joint hypertrophy (Exhibit B21F/7).
> Some of the abnormal physical examination findings and the claimant's

16

right shoulder surgery during the relevant period lend some support to the claimant's subjective complaints.

...

However, the undersigned finds the combination of many more normal physical examination findings, normal diagnostic testing results, normal physical examination findings after the claimant's right shoulder surgery, the claimant's statements to medical providers after her right shoulder surgery and the claimant's activities of daily living lend more support to the claimant's ability to engage in work at the light exertional level. For example, between September 2017 and May 2018, Christopher Graham, PA-C, found the claimant to have normal motor strength, normal muscle tone and intact sensation of the bilateral upper extremities (Exhibits B8F/10, 12, 26 & 39). Moreover, in October 2018, David Christianson, MD, found the claimant to have no abnormalities of the bilateral upper extremities (Exhibit B16F/12 & 19). Then, in November 2018, Kristian French, MD, found the claimant to have full motor strength, normal muscle tone, intact sensation and normal deep tendon reflexes of the bilateral upper extremities (Exhibits B20F/21).

Later, in February 2019, a nerve conduction study found the claimant to have normal nerve signals of the left upper extremity with only some slight polyphasic long duration motor units of the left extensor indicis (Exhibits B20F/33). Additionally, between February 2019 and May 2019, Steven Klepps, MD; and Thomas Owen, MD, found the claimant to have a full range of motion and normal deep tendon reflexes of the bilateral upper extremities (Exhibits B21F/6-7, 10, 13 & B30F/3). In February 2019, an imaging report found the claimant to have no evidence of a full-thickness rotator cuff tear, rotator cuff pathology with only mild acromioclavicular joint hypertrophy of the right shoulder (Exhibit B21F/7). Furthermore, between March 2019 and April 2019, James English, PsyD, found the claimant to have high average tactile perception and normal grip strength of the right upper extremity (Exhibit B28F/9). Moreover, in September 2019, shortly after the claimant's right shoulder surgery, Tad Stichman, PA-C, found the claimant to have full motor strength, normal deep tendon reflexes and intact sensation of the right upper extremity. PA-C Stichman noted that the claimant reported that she was "doing great," her range of motion is "a lot better" and her pain "significantly improved" after her right shoulder surgery (Exhibit B30F/8). Then, in December 2019, DPT Hansen, found the claimant to have a minimally reduced range of

motion and minimally reduced strength of the right shoulder. DPT Hansen also noted that the claimant stated that her right shoulder range of motion has improved "greatly" and that she has less pain overall (Exhibits B33F/27-31).

The undersigned notes that despite the claimant's bilateral upper extremity impairments, the claimant was able to engage in varied activities of daily living that lend more support to the claimant's ability to engage in work at the light exertional level. For instance, as of August 2018, the claimant was able to prepare meals, perform household chores, care for pets, walk to get around, drive a motor vehicle, shop in stores, pay bills, handle a savings account, attend medical appointments and watch television (Exhibit B3E). Moreover, the claimant told various medical providers during the relevant period that she was able to frequently travel, drive to medical appointments, care for pets, get married, tend to her garden, watch movies at the movie theater and use a treadmill for exercise (Exhibits B7F/4, 43, B8F/43, B17F/31, B18F/5, B25F/20, B30F/2, B31F/14, B32F/2 & B33F/3). Furthermore, in November 2019, just after her right shoulder surgery, the claimant told Dr. Klepps that she had a difficult time getting back to physical therapy because she had been traveling (Exhibit B32F/2, *see* Claimant Testimony).

(A.R. 25-27.)

The ALJ also reviewed Durham's claims of limitations based on her narcolepsy, headaches, and mental health issues but similarly found that the majority of objective medical evidence and the claimant's testimony pointed to Durham's ability to engage in light exertional work. (A.R. 27-29.) Considering this evidence together, the ALJ concluded that Durham's symptoms warranted limitations on her RFC but no more than the ones the ALJ recommended. (A.R. 29-30.)

Based on this review, the Court finds that the ALJ provided specific, clear, and convincing reasons to discount Durham's testimony relating to her symptoms. The ALJ cites numerous opinions from Durham's medical providers about the care given to Durham to address her specific complaints. The Court's own review of the medical records supports the ALJ's findings. The ALJ further distinguished Durham's claims regarding the severity of her symptoms with her own statements about her daily activities, noting that Durham indicated she could handle personal care, prepared meals, handled pet care, drove in cars, performed household chores, and shopped alone for grocery and personal items. (A.R. 27, 28.) Durham takes issue specifically with the ALJ's reference to Durham getting married during the relevant period because, while Durham is divorced and currently has a boyfriend, she is not married. (Doc. 8 at 23.) The Court acknowledges that the ALJ was mistaken in her reference to marriage. However, the remaining activities cited by the ALJ that Durham undertook in her daily living are supported by the record and the claimant's testimony. A single error in determining a claimant's daily activities is deemed harmless when substantial evidence supports the remaining symptom evaluation. *Batson v. Comm'r of Soc. Sec. Admin.* 359 F.3d 1190, 1197 (9th Cir. 2004).

**C.    Vocational Consultant's Hypothetical**

Hypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). "The testimony of a vocational expert 'is valuable only to the extent that it is supported by medical evidence.'" *Magallanes*, 881 F.2d at 756 (quoting *Sample*, 694 F.2d 639, 644 (9th Cir. 1982)). If the assumptions in the hypothetical are not supported by the record, then the vocational expert's opinion that the claimant has a residual working capacity has no evidentiary value. *Embrey*, 849 F.2d at 422.

Durham argues that the hypothetical the ALJ relied on to find she could perform other work at step five was deficient because it did not incorporate all of her limitations. Specifically, Durham asserts the ALJ "failed to present the vocational consultant with the limitations imposed by SSR 96-8p including the frequency and the duration of treatment . . . ."[1] (Doc. 8 at 31.)

An ALJ's failure to consider the effect of a claimant's treatment needs constitutes reversible error. *See e.g. Tyler v. Saul*, 2021 WL 2562492, *6 (D. Mont. June 23, 2021) (finding ALJ erred by failing "to note, weigh, or otherwise consider the frequency of treatment entirely in their decision"); *Mariah v. Saul*, 2021 WL 1660947, *8 (D. Mont. April 28, 2021) (remanding action where the ALJ

---

[1] Durham also asserts that the ALJ failed to incorporate the limitations from Dr. English's neuropsychological assessment in the hypotheticals posed to the VE. However, Durham fails to describe what those limitations were or how the ALJ failed to include them in the hypotheticals.

failed to consider the plaintiff's treatment needs in assessing the RFC); *Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir. 1980) (finding the ALJ's decision was not supported by substantial evidence because the effect of the claimant's treatment regimen for back injury was ignored); *Kim v. Saul*, 2020 WL 872308, *9-11 (D. Minn. Jan. 28, 2020) (holding that where the objective evidence showed the plaintiff had medical appointments on more than 50 days in a 33-month period, "the ALJ must explain how this course of treatment is reconcilable with the vocational expert's testimony regarding tolerated absences").

At the hearing, the ALJ posed several hypotheticals to the vocational expert, each more restrictive than the last. (A.R. 207-213.) The vocational expert responded to the first three hypotheticals that, while the types of occupations were limited by Durham's abilities, there were jobs in the economy she could perform. (*Id.*). The ALJ then discussed a hypothetical where the individual would be "off-task 20 percent of an eight-hour work day and a 40-hour work week, including normal work breaks." (A.R. 212.) The ALJ considered the individual off-task whether that individual was at their workplace or someplace else entirely and not working. The hypothetical was "intended to take into consideration all times this individual might be off-task at work or absent entirely or leave work early or arrive at work late." (*Id.*) The vocational expert responded that these limitations would not allow an individual to work at the SGA level and find competitive employment

in the current economy specifically citing to the need for time off task. (A.R. 213.)
Despite this response, the ALJ failed to include any mention of the discussion in
her final decision. (A.R. 33-34.) Durham contends this failure to consider the need
for extensive time off-task was in error. Durham asserts, as demonstrated by the
medical record, that in 2018 she was seen 117 times for medical visits. In 2019,
Durham had 57 medical visits. (Doc. 8 at 31.) By Durham's calculation, this
amounts to 9.75 medical visits per month in 2018 and 4.75 medical visits in 2019.
(*Id.*) Obviously, Durham's need for time off work to attend medical appointments
will fluctuate from month to month, but the Court is persuaded by Durham's
argument, supported by the medical record, that her impairments have required
extensive medical care and will continue to do so in the future. Therefore, the
Court finds the ALJ's failure to consider the side effects of Durham's treatment,
including the documented need to miss workdays for medical visits, constitutes
reversible error.

## V.   REMAND OR REVERSAL

Durham asks the Court to remand the ALJ's decision.  (Doc. 8 at 32.)
"[T]he decision whether to remand a case for additional evidence or simply to
award benefits is within the discretion of the court." *Reddick*, 157 F.3d at 728.  If
the ALJ's decision "is not supported by the record, 'the proper course, except in
rare circumstances, is to remand to the agency for additional investigation or

explanation.'" *Hill*, 698 F.3d at 1162 (quoting *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004)).  "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded. Where, however, a rehearing would simply delay receipt of benefits, reversal [and an award of benefits] is appropriate." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).

The Court finds remand for further proceedings is appropriate.  On remand, the ALJ shall reconsider the weight she applies to the side effects of Durham's medical treatment including the possible need for time off-task and her possible need to miss multiple workdays in a month for doctor visits.

## VI.    CONCLUSION

For the foregoing reasons, the Court orders that the Commissioner's decision is REVERSED, and this matter is REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent herewith.

**IT IS ORDERED**.

DATED this ___28th___ day of February, 2022.

Susan P. Watters
SUSAN P. WATTERS
United States District Judge